IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore

Civil Action No. 19-cv-03289-RM-NRN

ADRIAN MARTINEZ,

    Plaintiff,

v.

SEAN JENNEIAHN,
LAUREN MACDONALD, and
PETER VORIS

    Defendants.

---

## ORDER
---

This case arises from the alleged excessive use of force by the Defendants, Sean Jenneiahn, Lauren Macdonald, and Peter Voris, all of whom were, at the time of these events, officers with the Lafayette Police Department. (ECF No. 22.) This matter is now before the Court on the Parties' cross-motions for summary judgment (ECF Nos. 72, 76.) The Defendants move for summary judgment on all claims. (ECF No. 72.) Martinez moves for summary judgment against Defendant Jenneiahn on his claims of excessive use of force. (ECF No. 76.) The motions are fully briefed. Upon consideration of the motions and related briefing, and the applicable law, and being otherwise fully advised, the Court finds and orders as follows.

    **I.    FACTUAL AND PROCEDURAL BACKGROUND**

Because the Court is evaluating whether the Defendants are entitled to qualified immunity, it will view the facts in the light most favorable to the Plaintiff. *Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010). The events in this case began when Martinez was assaulted in his home by some bounty hunters who were looking for his girlfriend. (ECF

No. 87-6, pp.185-86; ECF No. 91, pp.1-2.)  The bounty hunters used significant force against Martinez, despite the fact that he was not the person they were seeking—they used a TASER and OC Spray and shot Martinez with pepper balls.  (ECF No. 91, p.8.)  Martinez suffered sufficient injuries that he was taken to Good Samaritan Hospital by ambulance and admitted.  (ECF No. 91, p.2.)  While at the hospital, Martinez was not monitored or guarded by the police.  (Id.)  However, the hospital was informed that there were several warrants outstanding for his arrest.  (ECF No. 74.)

      The morning following his encounter with the bounty hunters and his admission to the hospital, Martinez left the hospital wearing only underwear and his hospital gown, and the hospital's security called the police.  (ECF No. 77-16; ECF No. 87-22.)  The hospital security informed the police that Martinez had been brought to the hospital because he had been tased and subjected to other uses of force the previous evening.  (Id.)  They told police that Martinez was heading in the direction of a nearby apartment complex.  (Id.)  Police officers, including Defendants Voris and Macdonald went to the apartment complex to look for Martinez.  (ECF No. 77-15; ECF No. 87-25.)  At no time did hospital security tell the police that Martinez had engaged in any threatening or violent behavior while leaving the hospital.  The hospital did inform the police, however, that there were several warrants outstanding for Martinez's arrest.  (ECF No. 77-16.)  The Defendants were later informed by dispatch that there were four warrants for Martinez's arrest, all for failures to appear.  (ECF No. 74.)  Two were for felony offenses and two were for misdemeanors, all of which were nonviolent.  (Id.)

      While searching the apartment complex for Martinez, the officers received a number of reports regarding his actions and locations.  They were informed that Martinez had been seen (1) crawling out of someone's truck and then taking off running; (2) under some stairs in the

complex and then running up the stairs; and (3) trying to get into various vehicles. (ECF No. 77-15; ECF No. 87-22.) A witness also informed them that Martinez had "contacted a lady driving out of the parking lot, attempting to get a ride." (ECF No. 87-5.) Defendant Macdonald also observed Martinez run past her vehicle. (ECF No. 77-15; ECF No. 73-4.) Martinez was also observed carrying a bag which Defendant Macdonald assumed was a bag of his belongings, taken with him from the hospital. (ECF No. 87-7.)

Defendant Voris eventually called for K9 support and Defendant Jenneiahn arrived with his police dog, Kenzi. Kenzi eventually signaled to the officers that Martinez was inside a locked closet on the third floor of the apartment complex. (ECF No. 73-3.) It is not clear from the record whether Martinez locked the door to the closet himself or whether it automatically locked after he went inside—the distinction is not relevant to the Court's analysis on these motions. The officers obtained keys from the complex's maintenance person, but were still unable to open the door and therefore used a crowbar to force it. (ECF No. 73-3; ECF No. 77-1; ECF No. 91, p.24). It is undisputed that Martinez did not communicate or respond to the officers during this process. (ECF No. 91, p. 14.)

The Court has reviewed the body camera footage of the encounter and concludes that it is clear that what happened next took less than one second—the officers opened the door and deployed Kenzi to place a bite hold on Martinez. (ECF No. 77-1.) On the video the sound of the door being forced is followed immediately by the sound of Martinez crying out in pain from the dog bite. (Id.) Martinez was inside what turned out to be a small, empty storage closet, lying on his side on the floor, wearing only his underwear. (ECF. No. 91, p.13.) Within twenty seconds of the officer's opening of the door, Kenzi had been removed. (ECF No. 91, p.27.) Martinez

suffered a four-centimeter gash in his arm as a result of Kenzi's bite hold.  (ECF No. 87-20; ECF No. ECF No. 91, p. 33.)

## II.     LEGAL STANDARDS

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018).  Applying this standard requires viewing the facts in the light most favorable to the nonmoving party and resolving all factual disputes and reasonable inferences in his favor.  *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).  However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.  *Anderson*, 477 U.S. at 248.

Qualified immunity shields individual defendants named in § 1983 actions unless their conduct was unreasonable in light of clearly established law.  *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014).  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11

(2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). "[W]hen a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id*. (quotation omitted). The district court may address the steps in either order. *Carabajal v. City of Cheyenne, Wy.*, 847 F3d 1203, 1208 (10th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 577 U.S. at 11 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). While the doctrine does not require "a case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

If the plaintiff fails to satisfy either part of his burden, the court must grant qualified immunity. *Id*. The Court considers whether, when viewing the facts in the light most favorable to the Plaintiff, qualified immunity is warranted. *Thomas*, 607 F.3d at 662.

In this case, Martinez has alleged violations of his Constitutional Rights under the Fourth Amendment due to Defendant Jenneiahn's use of excessive force, as well as due to an alleged conspiracy among the Defendants to use excessive force, and, relatedly, due to the failure of Defendants Macdonald and Voris to intervene to stop the use of excessive force against him.

Pursuant to 42 U.S.C. § 1983, plaintiffs can vindicate their rights if they suffer a deprivation of their Constitutional rights under color of law. The Supreme Court has explained that "§ 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

5

vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979)). The Court went on to conclude that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395 (emphasis original).

In evaluating whether an officer used excessive force against a plaintiff, the Court is required to balance the nature and quality of the invasion on the individual's Fourth Amendment rights against the government's countervailing interests. *Henry v. Story*, 658 F.3d 1235, 1239 (10th Cir. 2011). "When conducting this inquiry, 'the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir.2008)). The Court should therefore consider "three non-exclusive factors to determine whether an officer's use of force is reasonable: (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of officers or others, and (3) whether the suspect is actively resisting arrest or evading arrest by flight." *Id.* The test is an objective one "in light of the facts and circumstances confronting [the officer], without regard to their underlying intent or motivation." *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (quoting *Bauer v. Norris*, 713 F.2d 408, 411 (8th Cir. 1983)).

The Tenth Circuit has "held that '[a]n officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983.'" *Savannah v. Collins*, 547 F. App'x 874, 876 (10th Cir. 2013) (quoting *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008)). Specifically, an officer may be liable when they are both present at the scene of a

constitutional violation and have the opportunity to intervene but fail to do so. *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984), judgment vacated on other grounds by sub nom. *City of Lawton, Oklahoma v. Lusby*, 474 U.S. 805 (1985).

> To establish a constitutional violation under a 'failure to intervene' theory, [a plaintiff] must show: (i) the defendant officer was present at the scene; (ii) the defendant officer witnessed another officer applying force; (iii) the application of force was such that any reasonable officer would recognize that the force being used was excessive under the circumstances; and (iv) the defendant officer had a reasonable opportunity to intercede to prevent the further application of excessive force, but failed to do so.

*Erickson v. City of Lakewood, Colorado*, 489 F. Supp. 3d 1192, 1200 (D. Colo. 2020) (quoting *Martinez v. City & Cty. of Denver*, No. 11-cv-00102-MSK-KLM, 2013 WL 5366980, at *5 (D. Colo. Sept. 25, 2013)).

In order to prove an actionable conspiracy under § 1983, a Plaintiff must demonstrate that a combination of two or more persons, acting together, had "a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1228 (10th Cir. 2010), abrogated on other grounds by *Torres v. Madrid*, 141 S. Ct. 989 (2021).

### III. EXCESSIVE FORCE

#### A. Whether the Officers' Actions Were Reasonable

Viewing the facts in the light most favorable to Martinez's position, the Court concludes that it is undisputed that, from the point of view of the officers at the time they decided to deploy Kenzi to seize Martinez, to their knowledge, (1) they were dispatched as a result of a call to the police from the hospital where Martinez had been treated; (2) although there was no report that Martinez had acted violently, his behavior was strange; (3) several people saw Martinez running through the apartment complex in his hospital gown; (4) a witness reported seeing Martinez

"crawl out of someone's truck and take off running"; (5) Martinez was trying to get into other vehicles; (6) Martinez had stopped a woman driving out of the parking lot and tried to get a ride; (7) there were four warrants out for Martinez for failing to appear in court, two for felonies, although all were for non-violent offenses; (8) Martinez had run past one of the police cars and was later seen running upstairs; (9) Martinez had something in his hands, likely a plastic bag full of his belongings that he had brought from the hospital; (10) a police dog alerted that Martinez was located inside a locked storage closet; (11) the officers needed to use a crowbar to open the closet; (12) Martinez did not communicate with them while they were working to open the door; and (13) when the door to the closet was opened, Martinez offered no active resistance but the officers could not see his hands.

  Martinez suggests a number of different tactics which the officers could have used that would not have resulted in him receiving a four-centimeter wound in his arm. The Defendants concede that they could have used some of those suggested techniques. The reasonableness of a particular police action, however, does not necessarily turn on the existence of other, less intrusive tactics. *See Petit v. New Jersey*, 2011 WL 1325614 at *7 (D. N.J. 2011) ("Reasonableness is not a rigid standard that requires an officer to choose the single best possible response. It's more variable. The objective reasonableness standard permits an officer to select his reaction from a smorgasbord of alternative choices, with the single requirement that his action be justified by the circumstances."); *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) (noting that the Constitution "requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision.").

  Martinez also presents a significant quantity of evidence to show that his altercation with the bounty hunters was not attributable to his conduct, that he was not under arrest at the time he

was admitted to the hospital, and that he was never aware that the police were seeking him and therefore he could not have been fleeing from them in the apartment complex. The Court can assume that all of those contentions are correct—they do not assist Martinez here, however. As previously noted, the Court must evaluate the facts from the perspective of how they would have appeared to a reasonable police officer. The Court's "calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 387 (1989).

In this case, the facts, even when viewed in the light most favorable to Martinez, demonstrate that the police were called out to search for someone after a hospital called 911 to report that he had left in his hospital gown. The person for whom they were looking was reported to have been trying to get into more than one car, including one which was occupied. The person was seen running through the apartment complex wearing only his hospital gown, and then he concealed himself. The police did not know what was inside the storage closet where the dog had alerted—they could not know for certain that Martinez was inside it at all, nor could they know that it contained no objects that could be used as weapons against them. When they managed to break open the door, the officers had less than one second in which to decide to abandon their plan to use the dog to detain Martinez. Martinez was in a confined space that would not allow more than one officer to have entered, suggesting possible danger to the officer who had to do so. And if Martinez had been armed, the police might have been endangered by any indecision or inaction. The Court is hard-pressed to conclude that the decision to use Kenzi to restrain Martinez was unreasonable when considered under the totality of the circumstances.

Martinez argues, however, that the three-factor test favors a finding of excessive force. *See Henry*, 658 F.3d at 1239 (setting out the three factors to be considered in evaluating the

9

reasonableness of an officer's use of force). He points out that his underlying offenses were not serious—only two were felonies, and all four of them were non-violent. He also points out that he posed no immediate threat to the officers—he had no weapons, he was already injured from his encounter with the bounty hunters the night before, and at the time he was located he asserts that he was unconscious, lying in the fetal position clad only in his underwear. Finally, he argues that he could not evade arrest because he had no idea that the police were looking for him. Some of these contentions were unknown to the police and therefore have limited bearing on whether the officers acted reasonably. For purposes of this Order, however, the Court will assume that Martinez is right, and that under the three-factor test the police used excessive force. Therefore, the Court next turns to whether the law was clearly established that these actions constituted a violation of Martinez's rights.

### B. Whether the Law was Clearly Established

The Defendants contend that even assuming, *arguendo*, Martinez was subject to excessive force under the Fourth Amendment, the law was not clearly established at the time of the incident. "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *al-Kidd*, 563 U.S. at 741, alterations original, citations omitted). The right must be established not only as a broad proposition, but also with sufficient particularity so that "the 'contours' of the right are clear to a reasonable official." *Id.* at 665.

Martinez cites a number of cases that, he argues, prove that the law was clearly established at the time of this incident. The Court concludes, however, that the cases are

distinguishable. For example, in *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021), the officer defendant released his dog to bite the plaintiff, and hit the plaintiff in the face, *after* the police had already apprehended the plaintiff. Although the plaintiff had previously fled from the police, the Court concluded that the proper question was whether the plaintiff had been fleeing or actively resisting at the "precise moment" when the police used the force at issue. *Id.* at 1171. Martinez argues that, as in *Vette*, he was neither fleeing nor resisting at the moment that Defendant Jenneiahn released the dog because at that precise moment he was unconscious, lying on the floor, unarmed and not moving. In the Court's view, however, an important distinction in this case is that the police could neither *see* nor *communicate* with Martinez at the time that they decided to use the force at issue. Therefore, the police did not *know* that Martinez was already effectively subdued, assuming that he was. Martinez was not under *police* control at the point that they opened the door even if, as a practical matter, and from *his* point of view he could not have escaped or posed a danger to the police. Several of the other cases cited by Martinez are distinguishable on the same basis. *See, e.g. Perea v. Baca*, 817 F.3d 1198, 1203-05 (10th Cir. 2016) (the officers used a taser against a suspect who had already been tackled to the ground by the police, and they continued to tase him repeatedly even after he was effectively subdued and "brought under the officers' control"); *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (the suspect had been frisked, had his hands against a van with his back to the officers, and was making no aggressive moves or threats when the officers kicked him, struck him with a flashlight, choked him, and beat him); *McCoy v. Meyers*, 887 F.3d 1034, 1051-52 (10th Cir. 2018) (the suspect had already been rendered unconscious, handcuffed, his feet were zip tied, and was no longer resisting when the police struck him more than ten times on his head, shoulders, back, and arms).

Martinez also cites a number of cases that stand for the proposition that the police cannot use force without warning and giving a suspect the chance to comply. *See, e.g.*, *Trujillo v. City of Lakewood*, No. 08-cv-00149-WDM-CBS, 2009 WL 3260724 at *4 (D. Colo. Oct. 9, 2009) (a jury could conclude that police acted unreasonably when they released a dog without warning to attempt to catch a fleeing suspect who hid behind a mattress in an alley). Martinez asserts that no commands were given to him prior to the release of the dog. The Defendants do not dispute that they gave no commands to Martinez during the final few minutes of their efforts to enter the closet, but they provided deposition testimony from witnesses who said that they did hear commands given, including a warning that a dog would be sent in if Martinez did not comply. (ECF No. 77-7, pp. 29-33; ECF No. 77-8, pp. 29-30.) On a motion for summary judgment, once the moving party makes a showing that there is no genuine dispute of material fact, the non-moving party bears the burden of coming forward with at least some evidence to demonstrate that there is more than a metaphysical doubt about the material facts. *Sec. and Exch. Comm'n v. GenAudio, Inc.*, 32 F.4th 902, 920 (10th Cir. 2022). Martinez asserts that he was unconscious during the police's efforts to enter the closet, so he cannot himself swear that no warnings were given, and he has provided the Court with no evidence to contradict the evidence produced by the Defendants. The Court, concludes, therefore, that this case does not fall under the clearly established law regarding a failure to warn before using force.

Martinez cites two cases that comes close to the facts before the Court. In *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), the Fifth Circuit evaluated the use of a police dog to place a bite hold on a DUI suspect who was hiding inside a "cubbyhole," a fenced area for trash storage between two houses. The suspect was not actively resisting the police and they knew he had no weapon. *Id.* at 522. When they found him, the police ordered him to raise his hands,

which he did not do, and the police argued that he therefore was resisting arrest. *Id.* at 523. The Court noted, however, that the suspect had his hands on top of the dog's head at the time, where they were clearly visible to the police. *Id.* The suspect also rolled onto his stomach when the police commanded him to do so. *Id.* The Court concluded that, under the circumstances of that case, the police were not entitled to qualified immunity. *Id.* at 526. The distinction between *Cooper* and this case is clear merely from the recitation of the facts—although Cooper was "hiding" inside cubbyhole, the police could clearly see him, and he was responding to their commands. Martinez, on the other hand, was concealed from the police and nonresponsive to them. Those facts are significant when considering the situation from the point of view of a reasonable police officer. If officers are unable to see or communicate with an individual, then it is reasonable that they would have greater concern for their safety when initiating an encounter. The Court concludes, therefore, that *Cooper* is distinguishable and did not put the officers on notice of a clearly established rule.

In *Landon v. City of North Port*, 745 Fed.App'x 130, 131 (11th Cir. 2018), the police were called to assist with locating the plaintiff who had tried to commit suicide using a knife and who then fled into the woods wearing nothing but his underwear. The police located the plaintiff with the assistance of a police dog—they found him lying on the ground, partially concealed by a bush. *Id.* at 132. The officers stopped approximately fifteen feet away from the plaintiff ordered and him to show his hands. *Id.* One of the officers drew his gun and pointed it at the plaintiff. *Id.* Although the plaintiff was bleeding from a self-inflicted wound, and never made any moves towards the officers, (the Court noted that there was evidence that he was unconscious at the time), the police released the dog, who put a bite hold on the plaintiff and punctured his abdomen in two places. *Id.* The Eleventh Circuit concluded that the officers could not have reasonably

13

considered the plaintiff to be a threat at the time they released the dog, and also pointed out that he was not suspected of having committed any crime. *Id.* at 135. The Court noted that the officers knew that the plaintiff was bleeding "profusely" and that the officers had ordered the dog to bit him while they were fifteen feet away. The Court concluded, therefore, that the officers were not entitled to qualified immunity. *Id.* at 136-37. Unlike in that case, however, these officers did not have the ability to see Martinez prior to the moment they released the dog. Nor did they have a gun trained on him in case he had, in fact, been able to threaten the officers or anyone else. Finally, although Martinez was not suspected of having committed any violent crimes, he did have four warrants out for his arrest, two of which were for felonies, and his behavior could have been reasonably interpreted to be an attempt to avoid the police. For all of these reasons, the Court concludes that the *Landon* case is not sufficiently similar to render any constitutional violation in this case a matter of clearly established law.

## IV. CONSPIRACY AND FAILURE TO INTERVENE

The 10th Circuit has previously held that a plaintiff seeking to prove a conspiracy to violate the individual's rights "in addition to proving an agreement, [is] required to prove an actual deprivation of a right 'secured by the Constitution and laws.'" *Dixon v. City of Lawton, Okl.*, 898 F.2d 1443, 1449 (10th Cir. 1990) (quoting 42 U.S.C. § 1983). Thus, "to recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient." *Id.* Because the Court has already concluded that Martinez has not proven a deprivation of his rights under § 1983, his claims for a conspiracy to deprive him of those same rights also must fail.

Similarly, "[a]n underlying constitutional violation is a precondition of a failure-to-intervene claim." *Hicks v. Craw*, 405 F. Supp. 3d 374, 385 (N.D.N.Y. 2019); *see also Shepard v.*

14

*Perez*, 609 F. App'x 942-43 (9th Cir. 2015) ("A failure-to-intervene claim requires an underlying constitutional violation."). Therefore, Martinez cannot prove his claim against the Defendant officers for failing to intervene and that claim, too, must be dismissed on summary judgment.

## V.      CONCLUSION

Based on the foregoing, it is **ORDERED**

(1) That Defendants' Motion for Summary Judgment (ECF No. 72) is GRANTED;

(2) The Plaintiff's Motion for Partial Summary Judgment (ECF No. 76) is DENIED AS MOOT;

(3) All other currently pending motions are also DENIED AS MOOT;

(4) That, in accordance with this Order the Clerk shall enter JUDGMENT in favor of Defendants and against Plaintiff; and

(5) That there being no remaining claims or parties, the Clerk is directed to close this case.

DATED this 17th day of June, 2022.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge